**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

QUENTIN W. JILES, §
§
*Plaintiff,* §
§
v. § CIVIL ACTION H-16-2080
§
WRIGHT MEDICAL TECHNOLOGY, INC., §
§
*Defendant.* §

### MEMORANDUM OPINION AND ORDER

Pending before the court is a motion for summary judgment filed by defendant Wright Medical Technology, Inc. ("WMT"). Dkt. 27. Having considered the motion, response, reply, record evidence, and applicable law, the court is of the opinion that the motion should be GRANTED.

## I. BACKGROUND

This case relates to plaintiff Quentin W. Jiles's former job as a delivery specialist with WMT. Dkt. 27. Jiles started working as a WMT delivery specialist on May 28, 2013. Dkt. 31, Ex. A (Jiles Aff.). WMT's delivery specialists make "pickups and deliveries of medical implants and instruments to and from local hospitals, surgery centers, clinics/doctor's offices, the airport, bus station[s], and other locations for expedited shipments." Dkt. 27, Ex. D (official job description). They also act as liaisons between the field office and customers, and they assist in the local warehouse with processing kits or sets and with inventory. *Id.* During his tenure with WMT, Jiles would make ten to twelve deliveries and ten to twelve pickups per day. Dkt. 27, Ex. B (Jiles Dep.) at 19–20. He also regularly worked overtime, which WMT considered a "principle responsibility" of the job when "required to accommodate emergency situations and facilitate changing surgical

schedules." Dkt. 27, Ex. D at WMT 0052–53. The official job description lists overtime as an "essential function" of the job. *Id.*

## A. First FMLA Leave and Workers' Compensation Claim

On April 4, 2014, Jiles was involved in an automobile accident while working. Dkt. 31, Ex. A (Jiles Aff.). Jiles saw a doctor regarding his injuries from the accident on April 7, 2017, and the doctor determined that Jiles suffered "a cervical strain on his shoulder and upper arm," contusions on his face, scalp, and neck, and elevated blood pressure. *Id.* The doctor said that Jiles was unable to drive a company vehicle for two weeks. *Id.* Consequently, Jiles initiated a workers' compensation claim. *Id.*

Jiles asserts that he "felt obvious tension coming from [his supervisor]" when he informed him that the doctor had said that Jiles could not drive for two weeks. *Id.* The supervisor reportedly stated that there was not enough light duty work to keep Jiles busy, a proposition with which Jiles disagreed. *Id.* Jiles was placed on medical leave pursuant to the Family Medical Leave Act ("FMLA") and short-term disability from April 7, 2014, through May 8, 2014. *Id.* Jiles returned to work on or about May 8, 2014, with no restrictions. Dkt. 31, Ex. B (Jiles Dep.) at 50. Prior to the accident, Jiles had been the only delivery driver; after the accident, there were, including Jiles, three delivery drivers. *Id.*; Dkt. 31, Ex. A.

## B. Second FMLA Leave

On May 28, 2014, Jiles saw a physician at Concentra Medical Centers at WMT's request. Dkt. 31, Ex. B. The doctor informed Jiles that Jiles's blood pressure was high. *Id.* According to Jiles, he told his boss and hub manager about the high blood pressure, and they told him to continue working. Dkt. 31, Ex. A ¶¶ 15–16. In early June 2014, Jiles saw his own physician, Dr. Aldinger, and Aldinger determined that Jiles had high blood pressure and needed to rest for two weeks.

2

Dkt. 27, Ex. E (Brown Dep.) at 42; Dkt. 27, Ex. L (physician note); Dkt. 31, Ex. A (Jiles Aff.).  Jiles

commenced two weeks of short-term disability, which was a paid leave of absence.  Dkt. 31, Ex. A.

This leave extended beyond two weeks.  On July 18, 2014, Jennifer Brown with the human

resources department at WMT emailed Jiles to inform him that his short-term disability benefits

would be exhausted as of July 21, 2014, and that if he was unable to return to work the leave would

be non-paid FMLA leave.  Dkt. 27, Ex. N.  Jiles responded that he would like to use his remaining

sick leave for July 24.  *Id.*

In the meantime, on June 24, the hub manager for the Houston office, Tricia Hubenak,

advised Brown that they needed a third driver in Houston as "this guy is really hurting us with the

Workman's comp and now this. . . . What are my options with this employee?"  Dkt. 34-3, Ex. 8.

The next week, when Jiles did not return to work, Hubenak asked Brown in an email if there were

any updates as "[t]his is killing us in Houston."  Dkt. 34-3, Ex. 9.  Hubenak again advised that WMT

needed a third driver and that if Jiles could not perform his duties as a delivery specialist, then he

"need[ed] to get a desk job or something" because they could not "continue to operate with two

drivers."  *Id.*  She again asked what the options were and noted that the "staff here is getting very

frustrated and working overtime and I am going to end up losing good employees because of this."

*Id.*

## C.    Jiles Is Ready to Return to Work

On or about August 4, 2014, Jiles stated that he was ready to return to work.  Dkt. 31;

Dkt. 32-1 (Jiles Dep.) at 116.  Jiles's physician, Dr. Aldinger, had completed a WMT form entitled

"Update of Restrictions & Return to Work Form."  Dkt. 27, Ex. P.  On this form, Aldinger indicated

that Jiles could not work overtime or work in heat of 90 degrees or below 32 degrees.  *Id.*  However,

Aldinger specifically stated that Jiles could resume the work capacity profile attached, which was

the work capacity profile for a WMT delivery specialist. *Id.*; Dkt. 32-2, Ex. 6; Dkt. 33-1 (Aldinger Dep.) at 33. Aldinger testified that Jiles had uncontrolled hypertension and that he did not want to pressure Jiles with more than a routine 40-hour work week and did not want him unloading "a bunch of stuff" in the heat. Dkt. 27, Ex. H (Aldinger Dep.) at 48–49. Aldinger believed that there was a possibility the restrictions could have been lifted, but he could not testify as to how long they would need to be in place. *Id.* at 49.

## D.      But WMT Is Not Ready

WMT did not permit Jiles to return to work on August 4. Dkt. 34-3, Ex. 16. Rather, after receiving Aldinger's recommendations, WMT consulted with a third-party medical reviewer, Dr. Robinson, regarding what WMT perceived to be restrictions placed on the type of work Jiles could do. Dkt. 27 & Ex. Q (Robinson Dep.) at 23. Robinson advised that he "would not concur with [Jiles] working as a driver in this particular job unrestricted" until the medical restrictions were lifted. Dkt. 27, Ex. Q at 25–26. He did not feel any clarifications regarding Aldinger's restrictions were necessary, as "[i]t was very straightforward." *Id.* at 25.

On August 19, 2014, Brown (from WMT's human resources) sent Jiles an email to "follow up on [their] ongoing conversation over the past few weeks regarding [his] leave of absence and [his] return to work." Dkt. 27, Ex. O. Brown advised Jiles that his FMLA leave would be exhausted on August 20, 2014, and that WMT had "a significant safety concern regarding [Jiles's] ability to perform the essential functions of [his] current position." *Id.* She requested a meeting with Jiles to "discuss [Jiles's] current restrictions and any reasonable accommodation that would allow [him] to perform [the] essential functions within the restrictions provided by [his] physician and in a manner that is safe for [him] and others." *Id.*

According to Dena Bangma, a human resources manager at WMT, Jiles acknowledged that he understood WMT's concerns when he spoke to her on August 20, 2014. Dkt. 27, Ex. G (Bangma Dec.). Jiles contends that he spoke with both Bangma and Brown on this day, and he "sensed frustration on WMT's part" and "could hear Ms. Bangma sighing." Dkt. 31, Ex. A. He testified that he felt "real low" when Bangma told him that WMT was "'managing just fine without [him].'" Dkt. 32-1 at 108.

**E.      Jiles's Termination**

While Brown noted the possibility of "reasonable accommodations" in her August 19 email to Jiles, WMT ultimately determined that there was no delivery specialist position that worked in a climate-controlled environment and that there were no vacant positions at the Houston hub for which Jiles was qualified. Dkt. 27, Ex. G (Bangma Dec.). Jiles's employment with WMT was terminated on August 27, 2014. Dkt. 27, Ex. R (separation notice). The decisionmakers were Brown, Bangma, and their manager, Lisa Stringer, in collaboration with the medical review officer, Robinson. Dkt. 35-1 (Bangma Dep.) at 85. The reason stated on the separation notice was "Family Medical Leave exhausted... unable to accommodate restrictions." Dkt. 27, Ex. R (alteration in original).

**F.      Discrimination Claim**

Jiles filed a claim with the Equal Employment Opportunity Commission ("EEOC") on August 28, 2014, and received a right-to-sue letter. Dkt. 1. Jiles filed this lawsuit on July 13, 2016. *Id.* He initially asserted the following claims (1) disability discrimination pursuant to the Americans with Disabilities Act ("ADA"); (2) race discrimination pursuant to Title VII and 42 U.S.C. § 1981; (3) retaliation pursuant to Chapter 451 of the Texas Labor Code for discharging Jiles for seeking

benefits under the Texas Workers' Compensation Act ("TWCA"); and (4) violation of his rights under the FMLA, including interfering with, restraining, or denying him the exercise of the his FMLA rights and retaliation against him following his FMLA leave of absence. *Id.* On November 15, 2016, Jiles filed an amended complaint that did not include the race discrimination claim. Dkt. 14.

### G.    Motion for Summary Judgment

On September 29, 2017, WMT filed a motion for summary judgment. Dkt. 27. It argues that all of Jiles's claims should be dismissed because (1) Jiles could not safely perform the essential functions of his job with or without reasonable accommodations; (2) Jiles cannot prove a reasonable accommodation claim under the ADA; (3) Jiles cannot meet his prima facie burden for his FMLA claim; and (4) Jiles has no evidence of a causal connection between his termination and the filing of his TWCA claim. *Id.*

Jiles asserts that summary judgment is improper because (1) WMT did not even explore reasonable accommodations; and (2) there is evidence that his supervisors were perturbed that he took Workers' Compensation and FMLA leave. Dkt. 31. Jiles contends that any alleged legitimate reason for his termination is pretext because his supervisors were unconcerned about him performing his job functions after his Workers' Compensation leave but before his FMLA leave, yet when he returned from the FMLA leave there was allegedly a safety concern. *Id.*

The motion is now ripe for disposition. The court will first discuss the legal standard for summary judgment and then will determine whether WMT is entitled to summary judgment for each of Jiles's claims *in seriatim*.

## II. LEGAL STANDARD

A court shall grant summary judgment when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] fact is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). If the moving party meets its burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e). The court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 524 (5th Cir. 2008).

## III. ANALYSIS

### A. Disability Discrimination Under the ADA

Jiles contends that WMT discriminated against him in violation of the ADA. Dkt. 14. WMT seeks summary judgment on this claim, asserting that it terminated Jiles's employment because he could not perform the essential functions of his job. Dkt. 27.

The ADA provides that no entity "shall discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees . . . and other . . . privileges of employment." 42 U.S.C. § 12112(a). A qualified individual is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds." 42 U.S.C. § 12111(8). A disability is "a physical

or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A).

In ADA discriminatory-termination actions, an employee may (1) present direct evidence of discrimination because of a disability or (2) proceed under the burden-shifting analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973). *See EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014). Jiles provides no direct evidence of discrimination. Under the *McDonnell Douglas* analysis, Jiles must first make a prima facie showing of discrimination. *See LHC Grp.*,773 F.3d at 694 (citing *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009)). To establish a prima facie case of discrimination, Jiles "must prove (1) that he has a disability; (2) that he was qualified for the job; [and] (3) that he was subject to an adverse employment action on account of his disability." *Id.* at 695 (alteration in original) (quoting *Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 853 (5th Cir. 1999)). If Jiles is successful in establishing a prima facie case, the burden of production shifts to WMT to articulate a legitimate, nondiscriminatory reason for terminating Jiles. *See id.* Then, the burden shifts back to Jiles to show that WMT's proffered reason is pretextual. *See id.*

WMT argues that summary judgment should be entered in its favor on Jiles's disability discrimination claim because Jiles cannot meet the second prong of his prima facie burden—showing he was qualified for the job. Dkt. 27. A qualified individual is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds." 42 U.S.C. § 12111(8). WMT contends that at the time of his termination, Jiles could not meet the essential functions of his job because he could not work overtime and could not work in temperatures exceeding ninety degrees. Dkt. 27. WMT also contends that Jiles was not

qualified because he was a "direct threat" to the health and safety of others. *Id.* The court will first address the essential functions argument and then turn to the safety concerns.

### 1. Essential Functions

Whether a function is "essential" must be determined on a case-by-case basis. *Credeur v. La. Through Office of Attorney Gen.*, 860 F.3d 785, 792 (5th Cir. 2017). The ADA itself provides some guidance on how to determine if a function is "essential":

> For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8); *see Credeur*, 860 F.3d at 792. Courts, of course, should not "give blind deference to an employer's judgment," and should "instead evaluate the employer's words alongside its policies and practices." *Credeur*, 860 F.3d at 794. Courts may use the EEOC's seven non-exhaustive factors to balance whether a job function is essential:

> (i) The employer's judgment as to which functions are essential;
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
> (iii) The amount of time spent on the job performing the function;
> (iv) The consequences of not requiring the incumbent to perform the function;
> (v) The terms of a collective bargaining agreement;
> (vi) The work experience of past incumbents in the job; and/or
> (vii) The current work experience of incumbents in similar jobs.

*Id.* at 792 (quoting 29 C.F.R. § 1630.2(n)(3)).

### a. The Arguments

WMT argues that the written job description states that overtime is an essential function, that it informed Jiles when he was hired that overtime was required, that Jiles admits overtime was

required, and that Jiles actually worked overtime as a delivery specialist. Dkt. 27 at 11. WMT provides evidence that in the pay cycle immediately preceding Jiles's termination, 88% of WMT delivery specialists worked overtime, and 100% of the delivery specialists in Houston worked overtime. *Id.* (citing Dkt. 27, Ex. G ¶ 6 & Ex. K).

WMT additionally argues that working in an environment where temperatures exceeding 90 degrees was an essential function of Jiles's job. Dkt. 27 at 12. WMT notes that Jiles admits that he made approximately ten to twelve deliveries and ten to twelve pickups per day, and that it is undisputed that the temperature in Houston often exceeds 90 degrees during the day. *Id.* at 13. Since delivery drivers must exit the vehicle for deliveries and pickups, WMT contends that being exposed to heat in excess of 90 degrees was an essential function of Jiles's job, and Jiles could not perform that essential function under his physician's restrictions. *Id.*

Jiles argues that the job description and WMT's business records make clear that overtime and marked temperatures were not essential functions of his job. Dkt. 31 at 34. He states that WMT defined the duties of Jiles's position in the documentation provided to his physician as not requiring work in marked temperatures and having work hours from 8:00 a.m to 5:00 p.m. *Id.* Jiles additionally asserts that his actual overtime hours, even before WMT hired two new drivers, were minimal. *Id.* He contends that all of the cases cited by WMT indicate that such "marginal" duties are by definition not "essential." *Id.* (providing the following citation: "*See all the cases cited by WMT in its Motion*"). Jiles additionally asserts that his hypertension had been successfully controlled by the time Aldinger released him to work and that he was qualified with or without accommodations. *Id.*

First, the court will examine the main cases relied upon by the parties relating to whether overtime and exposure to extreme temperatures can be essential functions of a job. Then, it will review the written job description and the evidence provided regarding the extent to which WMT delivery specialists work overtime and are exposed to extreme temperatures, in an effort to balance the EEOC factors discussed in *Credeur*. Finally, the court will consider Jiles's argument that he was qualified with or without accommodations because his hypertension was controlled.

### b. The Overtime and Outdoor Environment Cases

With regard to overtime, WMT relies on *Gonzalez v. Texas Health & Human Services Commission*, No. 5:13-cv-183-DAE, 2014 WL 6606629, at *11 (W.D. Tex. Nov. 19, 2014), *Tjernagel v. Gates Corp.*, 533 F.3d 666, 673 (8th Cir. 2008), and *United Paperworkers International Union, Local 1737 v. Inland Paperboard & Packaging, Inc.*, 25 F. App'x 316, 319 (6th Cir. 2001). In *Gonzalez*, Judge Ezra in the Western District of Texas, while considering the defendant's motion for summary judgment, found that the plaintiff had not shown that she was "a qualified employee capable of performing the essential functions of her position" because she could not work overtime. 2014 WL 6606629, at *10–11. The court noted that there was "ample testimony" that "overtime work was necessary throughout the entirety of Plaintiff's employment" and the "volume of work required" that the employees in the plaintiff's position work overtime. *Id.* at *10. Additionally, the defendants judged it to be essential, and all the employees in the position worked overtime before, during, and after the time that the plaintiff worked there. *Id.* Moreover, while the job description did not list overtime as an "essential function," testimony indicated that employees were advised that overtime was mandatory during the application process. *Id.*

In *Tjernagel*, the plaintiff's job description stated that overtime was required and in the year at issue employees had worked twenty-two Saturdays. 533 F.3d at 673. The Eighth Circuit found that when the plaintiff's restrictions barred overtime, "she was unable to perform an essential requirement of her job, being in attendance at work when needed, thereby rendering her unqualified for ADA protection." *Id.* In *United Paperworkers*, the Sixth Circuit similarly found that overtime was an essential function of a position. 25 F. App'x at 320.

With regard to temperature, WMT cites *Cooper v. United Parcel Service, Inc.*, 368 F. App'x 469, 476 (5th Cir. 2010), *Suttles v. U.S. Postal Service*, 927 F. Supp. 990, 1007–08 (S.D. Tex. 1996), *Perry v. City of Avon Park, Florida*, 662 F. App'x 831, 835 (11th Cir. 2016), and *Mathis v. City of Red Bank*, 657 F. App'x 557, 561 (6th Cir. 2016). In *Cooper*, the Fifth Circuit noted that working in an environment of variable temperatures and humidity was an essential function of the plaintiff's job as a delivery driver for UPS. 368 F. App'x at 476. *Suttles* related to allergens rather than temperatures, but Judge Crone of the Southern District of Texas found that the plaintiff could not perform the essential functions of a job as a letter carrier because he could not be exposed to allergens such as dust, fumes, smoke, and pollen, and the plaintiff would be exposed to these allergens both in the mail room and outside, which is where mail carriers work. 927 F. Supp. at 1006–07.

In *Mathis*, the plaintiff, who had been diagnosed with lupus, could not work outside. 657 F. App'x at 559. The written essential functions for his job included both indoor and outdoor work and specifically noted that the job included exposure to temperature extremes. *Id.* The employer attempted to clarify the restriction on outside work with the plaintiff's physician, and the physician said that the plaintiff must only work indoors because his condition was triggered by exposure to

ultraviolet light. *Id.* at 560. The plaintiff argued—after the fact—that he could have worked with limited outdoor exposure if he wore protective clothing, but the Sixth Circuit determined that the employer correctly considered what the physician said the limitations were at the time of the plaintiff's termination and that it would be improper if the court considered the after-the-fact characterization of limitations. *Id.* The reasoning behind this conclusion was that considering after-the-fact characterizations of limitations "would encourage employers to doubt the necessity of accommodations demanded by doctors until the extent of disability was confirmed by a court." *Id.* at 561.

Similar to *Mathis*, *Perry* involved a plaintiff whose physician restricted her from working outside in hot or cold temperatures. 662 F. App'x at 833. The plaintiff's physician advised, when her employer asked for clarification, that the plaintiff needed to avoid direct sunlight and could work outdoors for no more than four hours and only if the temperature was above fifty degrees but below eighty degrees. *Id.* The Eleventh Circuit first reviewed the job description, which included eight duties, six of which must be performed outdoors. *Id.* at 835. It then considered the plaintiff's deposition and affidavit testimony, which indicated that she had substantial job responsibilities that occurred outdoors. *Id.* The court found that the "core of [the plaintiff's] duties consisted primarily of outside work" and that the "ability to perform outdoor work was therefore an essential function of [the plaintiff's] position." *Id.*

These cases make clear that (1) overtime can be an essential function of a job; (2) working outdoors or exposure to extreme temperatures can be an essential function of a job; (3) courts consider the written job description as an important factor in determining essential functions; (4) courts consider the actual duties of the plaintiff and others performing the job to be an important

factor in determining essential functions; and (5) the employer may clarify restrictions with a physician; but (6) courts should avoid allowing after-the-fact characterizations of the restrictions to impact the analysis. With this guidance, the court will now turn to the *Credeur* factors.

### c. The EEOC Factors Outlined in *Credeur*

#### i. The Employer's Judgment

The first factor, which is the factor given the "greatest weight," is whether the employer, WMT, considers the restricted function to be an "essential function." *Credeur*, 860 F.3d at 792. WMT presents a declaration from Bangma in which she states that WMT considers both overtime and exposure to extreme temperatures essential functions of the delivery specialist job. *See* Dkt. 27, Ex. G (Bangma Dec.) (stating that WMT considers "working overtime, as needed" and "working in temperatures exceeding 90 degrees" to be "essential functions" of the Delivery Specialist job in Houston).

Jiles, however, contends that the evidence demonstrates otherwise. He presents evidence that WMT gave Aldinger a form indicating that Jiles's regular work schedule is "8-5; M-F." Dkt. 34-2, Ex. 6; Dkt. 34-1 at 45–46. Jiles also points out that WMT gave Aldinger a form—the work capacity profile—that showed no "exposure to marked changes in temperature and humidity" was required. Dkt. 32-2, Ex. 1 at WMT 0054.

WMT replies that it clearly stated in the letter it sent to Aldinger before Jiles was hired that "'[i]t is expected that frequent overtime, i.e. extended, irregular hours and weekend days may be required.'" Dkt. 44 & Dkt. 27, Ex. I. Additionally, WMT sent Aldinger a copy of the job description, which states that overtime is required. *See* Dkt. 33-1 at 34, 40; Dkt. 33-2, Ex. 3. This job description does not list exposure to temperatures as an essential function. *See* Dkt. 33-2, Ex. 3.

This evidence, taken together, would indicate to any reasonable juror that WMT believed Jiles's "regular" hours were 8 to 5, Monday through Friday, but that overtime was required. There is, however, a question of fact with regard to temperatures. The delivery specialist work capacity profile indicates that exposure to marked changes in temperature and humidity is not required and the job description does not specifically address temperature, yet Bangma asserts WMT considered it an essential function. While certainly a reasonable juror could give credence to Bangma's assertion, a reasonable juror could also conclude that WMT's assertion on the work capacity profile that the position did not require exposure to marked temperatures calls Bangma's statement about WMT's belief into question.

### ii. Written Job Description

The second factor is any written job descriptions that were prepared before advertising and interviewing applicants. *Credeur*, 860 F.3d at 792. A review of the written job description provides support for WMT's contentions that overtime and, possibly, exposure to high temperatures is required. The written job description describes the "essential functions" as follows:

> Essential functions of position include making pickups and deliveries of implants and instruments to and from local hospitals, surgery centers, clinics/docter's offices, the airport, bus station, and other locations for expedited shipments. Excellent communication must be maintained with customers, sales management/reps, and both corporate and office personnel to ensure timely transportation of goods for surgical procedures. This position has responsibilities to be the liaison between the field office and Wright Medical customers for coordinating activities relating to the efficient use of company assets.
>
> When not driving , the courier will be assisting in the local warehouse processing kits/sets and inventory as needed. An annual driving abstract will be required to ensure certification for driving company fleet van.

Dkt. 27, Ex. D. Under "principle responsibilities," which are described in part as "'essential functions' of the job that must be performed," the form states that "[o]vertime/on-call will be required to accommodate emergency situations and facilitate changing surgical schedules." *Id.* The "work capacity profile" attached to the job description states that the job does not require "[e]xposure to marked changes in temperature and humidity." *Id.*

Thus, the job description clearly states that overtime is required for emergency situations and changing surgical schedules and that it is an essential function. Jiles has provided no issue of material fact suggesting otherwise.

With regard to temperature, as discussed above, the job description does not mention exposure to temperature, except for noting that there is no exposure to marked changes in the work capacity profile. However, the essential functions section describes delivering to various locations, and this leads to a reasonable inference that at least some of these Houston, Texas locations will require the driver to get in and out of a vehicle when it is hot outside.[1] WMT notes that delivering items in Houston in August does not require, as stated in the work capacity profile, marked changes in temperature. Rather, "it is hot and it stays hot." Dkt. 44 at 5. However, Jiles noted in his affidavit that his delivery truck was air conditioned. Dkt. 31, Ex. A ¶ 35.

Aldinger testified about his interpretation of the work capacity profile and job description as it relates to his heat restrictions at follows:

> Q: Thank-you. Did you discuss the restrictions that you presented to
> Wright Medical with Mr. Jiles?

---

[1] The court takes judicial notice of the fact that in August 2014, which is the month of Jiles's termination, the high temperatures ranged from 82 degrees to 99 degrees. *See* National Weather Service, Climate Graphs: Houston Intercontinental (August 2014), http://www.weather.gov/images/hgx/climate/graphs/IAH/2014_08_IAH_T.png.

A: Yes. As I – as I recall, we told him he could get back to work with his, uh – with pretty much his – the, uh, profile that they had on the form, that he should be able to handle that easily, but I recommended against the overtime and in thinking – in going through the form, we just checked the excessive heats, uh, uh – because we didn't want him in excessive heats, but really felt like that was not an issue with his operating in a[n] air-conditioned cab and, uh, in the buildings and things where there'd be very little heat exposure or cold exposure, if any, in Houston.

Q: Okay. So that heat exposure –

A: Was the main issue.

Q: The heat expose –

A: Yeah. Too – too high a heat, yeah.

Q: Okay. To the extent – okay. The high heat and in Houston outside is the – was the concern?

A: Right, right, right.

. . .

A: Especially summers, yeah, yeah.

Dkt. 33-1 (Aldinger Dep.) at 53–54. It appears that everyone agrees that it is hot in Houston in August, but there is a question of fact as to whether the written description adequately portrays that delivering packages requires exposure to excessive heat.

### iii. Amount of Time Spent on Function

The next factor is the amount of time spent on the job performing the function. *Credeur*, 860 F.3d at 792. WMT provides evidence that thirty-seven out of forty-two of its delivery specialists worked overtime during the pay cycle before Jiles's termination. Dkt. 27, Ex. G ¶ 6. The overtime amount per employee ranges from .5 hours to 30.75 hours, with an average (including the individuals who did not work overtime) of roughly 6.8 hours.[2] This is hardly insignificant. Jiles worked 65.5 hours of overtime in 2013, and he worked 35.25 hours of overtime for the partial year he worked in 2014. Dkt. 27, Ex. J. Jiles contends that the overtime he worked is inconsequential because he was

---

[2] The spreadsheet provided was a photocopy of a spreadsheet with extremely small font, so the estimate is rough because a few of the numbers were slightly smeared and difficult to read.

at times the only delivery driver in this market, thus making all of the overtime fall on him, and WMT had two additional delivery drivers at the time of Jiles's termination. Dkt. 31. However, WMT has demonstrated that all of the drivers in the Houston market worked overtime the week before Jiles's termination, which indicates that there was enough work for overtime to be required, at times, from all drivers in 2014. Additionally, WMT provides evidence that its business had increased significantly during this time period. Dkt. 44 & Ex. D. WMT has shown that its drivers, including Jiles, worked overtime, and Jiles has not provided any evidence that creates an issue of material fact with regard to this factor as it relates to overtime. With regard to temperature, neither WMT nor Jiles provide evidence about how much time Jiles or other delivery specialists spent in the heat.

### iv. Consequences of Not Requiring Jiles to Perform Functions

The next factor is the consequences of not requiring Jiles to work overtime or work in the heat. *Credeur*, 860 F.3d at 792. While there would presumably be business interests associated with Jiles not working overtime or being exposed to temperatures in excess of 90 degrees, neither party has presented evidence relating to this factor.

### v. Terms of a Collective Bargaining Agreement

The fifth factor is the impact of collective bargaining agreements, but there is no evidence that there was a collective bargaining agreement. *Id.*

### vi. Work Experience of Other Drivers

The final two factors are work experience of past incumbents in the job and the current work experience of incumbents in similar jobs. *Id.* While Jiles questions whether overtime was really necessary since there were now more drivers, WMT has presented uncontroverted evidence that the other delivery drivers worked overtime frequently.

18

### d.  Conclusion with Regard to Essential Functions

The court finds that, with regard to overtime, the balance of factors weighs so heavily in WMT's favor that no reasonable juror could conclude that overtime was not an essential function of the delivery specialist job.  The only fact that weighs in Jiles's favor is that WMT wrote that Jiles's regular hours were 9-5 on one of the forms it gave Aldinger.  This is insufficient evidence to create an issue of material fact with regard to overtime when the written job description, which Aldinger also had, listed overtime as an essential function and provided the reasons why overtime was required, a letter to Aldinger written before Jiles even started the position noted the importance of overtime, and Jiles and the other delivery specialists in Houston all worked overtime.  The court draws no conclusions with regard to exposure to temperatures, which is a much closer call.  Because Jiles's physician restricted him from performing one of the essential functions of his job—overtime—the court concludes that Jiles was not "qualified" for the job under the ADA.  He thus cannot establish a prima facie case of discrimination.

### e.  Hypertension Controlled

Jiles also argues that he was qualified because his hypertension was controlled when he requested to return to work on August 4, 2014.  Dkt. 31.  However, the record is clear that Jiles's physician, while releasing him to work, placed restrictions on what he could do.  For example, Aldinger's physician testified that he placed restrictions on Jiles's return to work:

> Q: Am I correct that you did, in fact, include restrictions on this form?
> A: Yes.  There were – yeah the – yes.
> Q: (By Ms. Harmon) Okay.  And – and am I correct that the restrictions that were included by you were no overtime and not working in heat over 90 degrees Fahrenheit and not working in cold less than 32 degrees Fahrenheit; is that correct?
> A: Correct.

> Q: Okay. So Mr. Jiles did, in fact, have restrictions upon his return to
> work – release to work; is that correct?
> MS. PATRICK: Objection. Form.
> A: Uh – yeah what's – what's written here, correct.

Dkt. 45, Ex. B at 39–40.  Thus, regardless of the extent to which Jiles's hypertension was "controlled" when he was cleared to return to work, his physician only cleared him to return *with restrictions*.  The overtime restriction rendered him unqualified.

Because Jiles was not qualified to perform all of the essential functions of the delivery specialist position, he cannot make out a prima facie case of discrimination under the ADA.  WMT's motion for summary judgment on Jiles's ADA discrimination claim is GRANTED.

### 2.    Safety Concern

Because the court finds that Jiles thus cannot meet his prima facie burden on his ADA claim, there is no need to address WMT's argument that Jiles was not qualified due to safety concerns.

## B.    Failure to Accommodate Claim Under the ADA

Jiles contends that WMT violated the ADA because it refused to accommodate him and refused to engage in interactive dialogue concerning his limitations.  Dkt. 14 ¶ 37.  Under the ADA, discrimination against a qualified individual includes failing to make reasonable accommodation for that individual unless such accommodation would impose an undue hardship on the entity.  42 U.S.C. § 12112(b)(5)(A).  Reasonable accommodations include "making existing facilities used by employees readily accessible to and usable by individuals with disabilities[,] job restructuring, part-time or modified work schedules, reassignment to a vacant position . . . and other similar accommodations."  42 U.S.C. § 12111 (9)(A)-(B).  To decide what reasonable accommodations will be implemented, the entity should engage in an informal, interactive process with the individual to

assess the limitations caused by the individual's disability and the possible accommodations that would overcome those limitations. 29 C.F.R. § 1630.2(o)(3).

If an employee's limitations caused by a disability are not "open and obvious" to the employer, it is the employee's responsibility to notify the employer of the limitations and suggest a reasonable accommodation. *Chevron Phillips Chem. Co.*, 570 F.3d at 621 (citing *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996)). Then, the employer must engage in a good faith interactive process, which is "a meaningful dialogue with the employee to find the best means of accommodating that disability." *Id.* (quoting *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 108 (1st Cir. 2005)). While the employee is entitled to reasonable accommodations, the employer is not obligated to adhere to the employee's preference and has final discretion as to the most effective accommodations that satisfy both the employee's and employer's needs. *EEOC v. Agro Distrib., LLC*, 555 F.3d 462, 471 (5th Cir. 2009) (citing 29 C.F.R. pt. 1630, App., § 1630.9).

Thus, in a failure to accommodate claim under the ADA, the employee bears the burden of demonstrating that the employer failed to implement a reasonable accommodation. *Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 682 (5th Cir. 1996). For instance, "reassignment to a different job may be a reasonable accommodation, but '[t]he plaintiff bears the burden of proving that an available position exists that he was qualified for and could, with reasonable accommodation, perform.'" *Moss v. Harris Cty. Constable Precinct One*, 851 F.3d 413, 418 (5th Cir. 2017) (quoting *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007)). If the employee meets this burden, the employer may utilize the affirmative defense that the accommodation would constitute an undue burden or that it would counteract a business necessity. *Id*.

"Once an individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate

accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the individual with a disability." 29 C.F.R. § 1630.9, App. (Westlaw) (Interpretive Guidance on Title I of the Americans with Disabilities Act). The employer should:

> (1) Analyze the particular job involved and determine its purpose and essential function;
> (2) Consult with the individual with a disability to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation;
> (3) In consultation with the individual to be accommodated, identify potential accommodations and assess the effectiveness each would have in enabling the individual to perform the essential functions of the position; and
> (4) Consider the preference of the individual to be accommodated and select and implement the accommodation that is most appropriate for both the employee and the employer.

*Id.*

WMT contends that Jiles must provide evidence that a reasonable accommodation was possible in order to proceed on a claim alleging a breakdown in the interactive process, and there can be no reasonable accommodation if the only accommodation is for the employee to not preform an essential function of his or her job. Dkt. 27 at 18. Thus, according to WMT, since Jiles could not work overtime or in temperatures exceeding 90 degrees and the only accommodation was for him not to work in these circumstances, there was no reasonable accommodation and Jiles's claim should be dismissed.

Jiles argues that WMT admits that it failed to discuss accommodations with Jiles, Aldinger, or Robinson. Dkt. 31 at 35. Jiles contends that most accommodations would have cost WMT very little and suggests a hand-held fan, mesh-clothed uniform, an earlier start time, different customers with covered parking, and warehouse work. *Id.* Jiles "felt the interactive process was a joke." *Id.*

He says that Bangma (HR) "laughed, sighed, interrupted him and offered him nothing." *Id.* at 35–36. He points out that Bangma testified that she never considered allowing Jiles to work forty hours or less for a month until Jiles had a follow-up exam, and the human resources representatives did not know how much time Jiles spent outside in the weather. *Id.* Additionally, WMT did not consider providing Jiles with an assistant or giving him a desk job. *Id.*

WMT replies that the ADA does not require an employer to modify the essential functions of an employee's position or create a new position for the employee. Dkt. 44 at 6. It asserts that since Jiles could not work overtime or in temperatures exceeding 90 degrees, he had the burden of submitting evidence that there was a vacant position for reassignment for which he was qualified. *Id.*

The court agrees with WMT. The only evidence Jiles presents that there was potentially a "desk job" at the company is the email from the hub manager, Hubenak. Dkt. 31 at 22. In the email, Hubenak states: "If he can't perform his job duties as a delivery specialist (obviously he can't) then he needs to get a desk job or something but we can't continue to operate with two drivers. We have three allocated to Houston for a reason. We have the business to support [three]." Dkt. 34-3, Ex. 9. Hubenak does not refer to a desk job *at WMT*. Viewing the evidence in the light most favorable to Jiles, the statement does not lead to a logical inference that Hubenak meant that there was an open desk job at WMT.

The ADA "does not require an employer to transfer from the disabled employee any of the essential functions of his job," and a court cannot determine that a plaintiff can perform the essential functions of his or her job with reasonable accommodation "if the only successful accommodation is for [the plaintiff] not to perform those essential functions." *Barber v. Nabors Drilling U.S.A., Inc.*, 130 F.3d 702, 709 (5th Cir. 1997). If Jiles were to continue as a delivery specialist, WMT would

have had to assign all overtime to the other drivers to conform with Jiles's medical restrictions, and it is not required to transfer the disabled employee's responsibilities that are essential functions to other employees. *Id.* (finding that the plaintiff was not qualified if it was "necessary to transfer any of the essential functions of the toolpusher job to others on the rig").

The main evidence of an attempt to engage in an interactive process is an August 19, 2014 email from Brown to Jiles advising that WMT needed to set up a meeting with Jiles to discuss the restrictions and "any reasonable accommodation." Dkt. 27, Ex. O. Jiles also discusses in his affidavit a conversation he had with Bangma and Brown on August 20, 2014. Dkt. 31-1. From Jiles's account, accommodation was mentioned but not really explored.[3] *See id.* at 4–8. Jiles contends that he was "brushed off" every time he mentioned "accommodations." *Id.* at 8. He additionally asserts that

> [t]here was never a conversation with me by WMT to modify my job duties to accommodate me. No changes to my work hours were ever discussed with me to accommodate me. No changes to the customer routes (e.g. giving me routes with covered parking, etc.) were discussed with me as a means of accommodating me. Light duty was never discussed with me. No equipment, uniforms, or tools (e.g. fans, mesh shirts, etc.) was ever discussed with me as a means of accommodating me. No consideration was given to providing me an assistant as a means of accommodating me.

*Id.* at 9. The problem with his argument is that he does not provide any suggested accommodation for not being able to work overtime, and it is his burden to show that there was a reasonable accommodation that the employer failed to implement. Jiles, instead, takes issue with whether

---

[3] WMT contends that Jiles's depiction of this conversation is inadmissible hearsay and edited to present a misleading depiction. Dkt. 44 at 7. WMT also makes some assertions about what the "actual conversation shows" without providing a citation to a transcript of the recording of the conversation. Dkt. 44 at 7 n.4. To the extent WMT is lodging a formal hearsay objection, that objection is OVERRULED. *See* Fed. R. Evid. 801(c)(2).

overtime was even necessary. *See, e.g.*, Dkt. 31-1 at 8–9. Since the court has already found overtime was an essential function and employers do not have to assign essential functions to other employees, Jiles's suggestion that WMT should have discussed changes to work hours is immaterial. WMT was not required to attempt to accommodate in this way. Jiles has presented no evidence that there were alternative jobs available for which he was qualified that did not require overtime.[4]

Jiles has not met his burden with regard to the accommodation claim. Accordingly, WMT's motion for summary judgment on this claim is GRANTED.

## C.    FMLA

Jiles's next claim is that WMT interfered with, restrained, or denied him the exercise of the his FMLA rights and retaliated against him following his FMLA leave of absence. Dkt. 14. WMT seeks summary judgment on this claim because (1) WMT did not interfere with Jiles's FMLA rights because Jiles received all the FMLA leave to which he was entitled; (2) WMT was not required to reinstate Jiles after his FMLA leave if Jiles could not perform the essential functions of his job; and (3) Jiles cannot establish that WMT retaliated against him because there is no similarly situated employee who was treated differently and, regardless, WMT had a non-discriminatory reason for terminating Jiles's employment. Dkt. 27. Jiles contends that WMT "trampled on Jiles' FMLA entitlements by (i) doing everything possible to discourage his usage thereof, (ii) failing to reinstate him after he was medically cleared to return to work, and (iii) terminating him." Dkt. 31. He argues that WMT interfered with his FMLA rights by discouraging his use of FMLA leave and violated the

---

[4]    The court takes no position on whether the accommodations Jiles proposes in his declaration would have been adequate with regard to the heat restriction since the overtime issue is dispositive.

FMLA by hiring other drivers during and after his leave and not reinstating him even though his physician medically cleared him to return to work. *Id.*

The FMLA provides that "any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave . . . to be restored by the employer to the position of employment held by the employee when the leave commenced." 29 U.S.C. § 2614(1)(A) (2008). An employee is an "eligible employee" under the FMLA if he or she has been employed by the employer for at least twelve months and has worked at least 1,250 hours of service during the previous twelve-month period. *Id.* § 2611(2)(A). Eligible employees "shall be entitled to a total of 12 workweeks of leave . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of the employee." *Id.* § 2612(a)(1)(D). "Serious health condition means an illness, injury, impairment, or physical or mental condition that involves . . . (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." *Id.* § 2611(11)(A)-(B). In order to preserve the availability of these rights, section 2615(a)(1) makes it "unlawful for an employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." *Id.* § 2615(a)(1).

### 1.    Interference Claim

Jiles first contends that WMT interfered with his FMLA leave by discouraging his use of FMLA leave. Dkt. 31 at 28. He points to comments by his supervisor and hub manager that indicate they were in a predicament if Jiles was unavailable to work and asserts that Bangma interrupted him and sighed when he spoke to her about returning to work. *See id.* WMT argues that, as a matter of law, Jiles received all the FMLA leave to which he was entitled, and Jiles's interference claim thus fails as a matter of law. Dkt. 44 at 8. WMT also contends that Jiles impermissibly relies on

inadmissible hearsay and that his allegations occurred outside of the FMLA's statute of limitations.

*Id.*

> To establish a prima facie case of interference, Jiles must show:
>
> > (1) he was an eligible employee; (2) his employer was subject to FMLA requirements; (3) he was entitled to leave; (4) he gave proper notice of his intention to take FMLA leave; and (5) his employer denied him the benefits to which he was entitled under the FMLA.

*Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017). Once the plaintiff establishes a prima facie case, the employer must provide a legitimate, non-discriminatory reason for the employment action. *Id.* Then, in order to prevail, "the plaintiff must raise an issue of material fact that the employer's proffered reason was pretextual." *Id.*

Here, Jiles does not contend that WMT denied him FMLA benefits. He argues that the actions of WMT's managers discouraged him from taking the leave, yet he was provided the leave and he took it. Thus, his evidence is more appropriately analyzed as a retaliation claim. *Cf. Stallings*, 447 F.3d at 1051 (finding that the employer had granted every request for FMLA leave and that the plaintiff's claim was "fundamentally a claim for retaliation and should be analyzed as such"). The difference between an interference and retaliation claim "is that the interference claim merely requires proof that the employer denied the employee his entitlements under the FMLA, while the retaliation claim requires proof of retaliatory intent." *Id.* "[T]he lines between the two categories [of FMLA claims] is not hard and fast." *Id.* (citation and quotations omitted). However, "[t]o prove an interference claim, a plaintiff 'must at least show that [the defendant] interfered with, restrained, or denied [his] exercise or attempt to exercise FMLA rights, and that the violation prejudiced [him].'" *Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 788 (5th Cir. 2017) (quoting *Bryant v. Tex.*

*Dep't of Aging & Disability Servs.*, 781 F.3d 764, 770 (5th Cir. 2015)).  Here, there has been no such showing, and Jiles's interference claim must thus be dismissed.

### 2. Reinstatement Claim

Jiles contends that one of the ways WMT "trampled" on his FMLA rights was by failing to reinstate him when he was medically cleared to return to work.  Dkt. 31 at 27.  WMT moves for summary judgment on Jiles's FMLA reinstatement claim because Jiles could not perform the essential functions of his delivery specialist job and thus could not be reinstated.  Dkt. 27.

Under the FMLA, **"**[a]n employee is not entitled to 'any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave.'" *Shirley v. Precision Castparts Corp.*, 726 F.3d 675, 681 (5th Cir. 2013) (quoting 29 U.S.C. § 2614(a)(3)(B)).  The employee is entitled to reinstatement following FMLA leave provided the statutory requirements have been met, including that the employee is actually entitled to the position to which he seeks reinstatement.  *Id.*  The employer "may challenge that entitlement by offering evidence that the employee would have lost his position even had he not taken FMLA leave." *Id.* (citing 29 C.F.R. § 825.216(a)).

WMT argues that the undisputed facts show that Jiles had no right to be restored to his position as a delivery specialist.  Dkt. 27.  It notes that under the FMLA, an employee must be restored to an equivalent position that is "virtually identical" to his previous position.  *Id.*  WMT asserts that the FMLA does *not* require reinstatement if an employee cannot perform the duties of his job and does *not* require an employer to place the employee in another position.  *Id.*  It contends that since Jiles could not perform the essential functions of a delivery driver after he received his full entitlement of FMLA leave, he could not be returned to the same or an equivalent position.  *Id.*

28

Additionally, even if he could, WMT contends it had a legitimate, nondiscriminatory reason for not reinstating Jiles. *Id.*

Jiles contends that WMT failed to reinstate him even though Aldinger fully released him to return to work, working forty hours per week as outlined in WMT's job description, offer letters and forms, and the description outlined by Brown on the forms she sent to Jiles's doctor. Dkt. 31 at 29 (citing Dkt. 34-1 (Brown Dep.) at 44–46; Dkt. 34-2, Ex. 6 (short-term disability form); Dkt. 32-2, Ex. 1 (job description) at 1; Dkt. 31-2 (Ex. G) (two forms indicating "work hours" or "normal work hours" are 8:00 to 5:00).

The evidence is clear that Aldinger cleared Jiles to work *with restrictions*. WMT has shown that Jiles could not perform an essential function of the delivery specialist position—working overtime. Thus, he would not have been entitled to his position even if he had not taken FMLA leave. Because there was no entitlement, WMT's motion for summary judgment on the reinstatement claim is GRANTED.

### 3. Retaliation Claim

Jiles also contends that WMT retaliated against him in violation of the FMLA by terminating his employment because he took FMLA leave. Dkt. 14. WMT moves for summary judgment on Jiles's FMLA retaliation claim because (1) Jiles has no evidence to support a prima facie case of retaliation; and (2) even if he could state a prima facie case, he has no evidence that WMT's reason for termination was pretext. Dkt. 27. Jiles appears to argue that the court should apply a mixed-motive analysis and then points to various evidence that he contends shows discriminatory and retaliatory motive. Dkt. 31.

> To prove FMLA retaliation, the employee must demonstrate: "1) he was protected under the FMLA; 2) he suffered an adverse employment action; and 3) he was treated less favorably than an

29

> employee who had not requested leave under the FMLA or the
> adverse decision was made because he sought protection under the
> FMLA."

*Acker*, 853 F.3d at 790 (quoting *Mauder v. Metro Transit Auth. of Harris Cty., Tex.*, 446 F.3d 574, 583 (5th Cir. 2006)). The third element requires a causal link between the protected activity and the adverse action. *Id.* When considering causation, the court should consider temporal proximity. *Mauder*, 446 F.3d at 583. "[T]he plaintiff does not have to show that the protected activity is the only cause of her termination," but the plaintiff must "show that the protected activity and the adverse employment action are not completely unrelated." *Id.* Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to show the plaintiff would have been terminated during the FMLA leave period and is thus not entitled to restoration of his or her position. *Id.* The burden then shifts back to the plaintiff to show pretext. *Id.*

The mixed-motive framework applies in cases where an employee "concedes that discrimination was not the *sole* reason for her [or his] discharge , but argues that discrimination was a motivating factor in her [or his] termination."[5] *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005). To prevail on a mixed-motive case,

> (1) the employee must make a prima facie case of discrimination; (2)
> the employer must articulate a legitimate, non-discriminatory reason
> for the adverse employment action; and (3) the employee must offer

---

[5]   In *Ion v. Chevron USA, Inc.*, the Fifth Circuit noted that the U.S. Supreme Court's decisions in *University of Texas Southwestern Medical Center v. Nasser* and *Gross v. FBL Financial Services Inc.* "have limited the applicability of the mixed-motive framework in cases involving Title VII and the Age Discrimination in Employment Act," and indicated that these decisions may impact FMLA cases as well. 731 F.3d 379, 389–90 (5th Cir. 2013) (citing *Nasser*, ___ U.S. ___, 133 S. Ct. 2517 (2013) and *Gross*, 557 U.S. 167, 129 S. Ct. 2343 (2009)). It declined, however, to address this issue in *Ion* because there was in issue of material fact under either standard. *Id.* at 390. The parties have not provided the court with any cases indicating that the Fifth Circuit has subsequently addressed the issue, and the court has found no such case. Accordingly, the court considers the standard stated in *Richardson* to still be the law of the Fifth Circuit.

> sufficient evidence to create a genuine issue of fact either that (a) the
> employer's proffered reason is a pretext for discrimination, or—and
> herein lies the modifying distinction—(b) that the employer's reason,
> although true, is but one of the reasons for its conduct, another of
> which was discrimination.

*Id.* "If the employee proves that discrimination was a motivating factor in the employment decision, the burden again shifts to the employer, this time to prove that it would have taken the same action despite the discriminatory animus. . . . The employer's final burden 'is effectively that of proving an affirmative defense.'" *Id.* (quoting *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 355 (5th Cir. 2005)).

### a. Prima Facie Case

The court will first consider whether Jiles can meet his prima facie burden.  The third prong is the only prong in dispute.  Jiles must present evidence creating an issue of material fac that he was either treated less favorably than an employee who had not requested leave under the FMLA or that the adverse decision was made because he sought protection under the FMLA.  As to being treated less favorably, Jiles contends that he has comparators because WMT has hired seven new delivery specialists since his accident, none of whom have a disability or filed a workers compensation claim and all of whom still have jobs.  Dkt. 31 (citing Dkt. 31, Ex. I).  The only showing of similarity between Jiles and these new drivers is that they occupied the same job.  Jiles has not shown that any of these other employees were subject to medical restrictions.  The court finds that there is not enough evidence of similarity in the record to create an issue of material fact with regard to the comparator element of the third prong.

Of course, having a comparator is only one of two ways to satisfy the third prong, and Jiles also presents evidence that supports his contention that WMT terminated his employment because he took FMLA leave.  First, WMT discharged Jiles immediately after he took FMLA leave, so any

inference arising from temporal proximity is strong. Second, there is evidence that Jiles's hub manager complained to human resources about the operational issues the company was having because Jiles was taking FMLA leave. *See* Dkt. 34-3, Ex. 8 (email from Hubenak to Brown and Bangma stating that "this guy is really hurting us with the Worker's comp and now this" and asking what the options were). The hub manager was not the decisionmaker, but she was complaining to the decisionmakers. Jiles's burden at the prima facie stage is very light—he merely has to show that the protected activity and the adverse employment action are not "completely unrelated." Jiles's assertion in his affidavit that he could hear Bangma "sighing" during his conversation with her relating to whether Jiles could return to work buttresses the inference that the hub manager's complaints impacted the decisionmakers. Dkt. 31-1. Considering the evidence in the light most favorable to Jiles, the court finds that the evidence presented creates an issue of material fact as to the third prong of the prima facie case.

### b. Legitimate Non-Discriminatory Reason and Pretext/Mixed Motive

Moving on to the next stage, WMT has presented sufficient evidence that it had a legitimate, nondiscriminatory reason for terminating Jiles's employment—because he was no longer qualified for the position. *See* Dkt. 27. Thus, the burden shifts back to Jiles to show either that this reason is pretext or, under the mixed-motive framework, it is only one of the reasons and discrimination is another reason.[6]

---

[6] WMT argues, in a footnote, that Jiles has, in effect, conceded the legitimacy of its proffered reason for termination by raising a mixed-motive argument. Dkt. 44 at 9 n.6. In *Richardson*, the Fifth Circuit stated that the mixed-motive framework applies only in cases where an employee "concedes that discrimination was not the *sole* reason for her [or his] discharge, but argues that discrimination was a motivating factor in her [or his] termination." *Richardson*, 434 F.3d at 333. However, in *Smith v. Xerox Corp.*, the Fifth Circuit indicated that this statement in *Richardson* "articulated the mixed-motive framework generally and was not meant the enumerate the required elements of a mixed-motive case." 602 F.2d 320, 332 (5th Cir. 2010), *abrogated by Nasser*, 133 S.

With regard to the third prong, Jiles provides some evidence that his supervisor complained about Jiles needing to take off after his accident ("Two weeks?!?! You can't drive for two weeks? What are we supposed to do?") and that he ordered Jiles to continue working after Jiles reported that medical tests revealed he had high blood pressure. *See* Dkt. 31, Ex. A (Jiles Aff.) ¶ 6; Dkt. 32-1 (Jiles Dep.) at 53–54. And, again, the hub manager complained to human resources about how she could not cover the volume of work without hiring a new driver due to Jiles's absence. *See* Dkt. 34-3, Ex. 8. While neither of the individuals making these comments was responsible for the decision to terminate Jiles's employment (*see* Dkt. 44, Ex. G at 63–64, 85), the court may consider this evidence under a "cat's paw" analysis, which is used when a plaintiff contends that a decisionmaker "was influenced by others who harbored discriminatory animus." *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004).

To invoke the "cat's paw analysis, the plaintiff must establish "(1) that a co-worker exhibited discriminatory animus; and (2) that the same co-worker 'possessed leverage, or exerted influence, over the titular decisionmaker.'" *Id.* (quoting *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2000)). The court finds that the evidence of animus from the emails and statements of Jiles's supervisor and hub manager, combined with the fact that the decisionmakers obviously needed to rely on managers in the field with regard to decisions about operations, and Jiles's assertion that Bangma was sighing during their conversation regarding his return to work, is sufficient evidence to create an issue of material fact on the third prong. A reasonable trier of fact could determine that the hub manager and supervisor influenced Brown and Bangma and that one of the reasons they decided to terminate Jiles's employment was because he took FMLA leave.

Ct. 2517. The court instructed that "the mixed-motive framework does not require the plaintiff to concede that the employer's stated reason was legitimate. That is why we have juries." *Id.* at 333.

### c. Whether WMT Would Have Terminated Anyway

The burden thus shifts back to WMT to show that it would have terminated Jiles's employment anyway. In *Richardson*, the Fifth Circuit reached this stage after finding evidence of retaliatory motive. 434 F.3d at 336. Specifically, the employee, who had been late to work several times unrelated to FMLA leave but had also requested FMLA leave for carpal tunnel syndrome, overheard her supervisor saying: "'We'll just fire her ass. We'll worry about it later.'" *Id.* at 335. When the employee asked the supervisor about this, he said "he was 'tired of all this stuff' going on with [the employee]." *Id.* The Fifth Circuit noted that a reasonable jury could interpret the supervisor's statement about "all this stuff" as referring to the employee's problems with attendance in general, which were violations of company policy, or it could interpret the statement as relating to FMLA leave. *Id.* The human resources representative had also made a comment about having accommodated the employee enough, and all of this was in close temporal proximity to the termination decision. *Id.* The court determined this evidence created a question of material fact as to retaliatory animus. *Id.*

Even though the court found a question of fact on the third prong, the Fifth Circuit ruled in favor of the employer after shifting the burden back to the employer. The court found that "the *only* reasonable conclusion a jury could make is that [the employer] would have fired [the employee] with or without retaliatory animus." *Id.* at 336. It noted that the employee had a long history of attendance problems and that the employer had a policy that four occurrences result in termination. *Id.* The employer demonstrated that it had always maintained a policy that attendance was key in termination decisions. *Id.* And, the employee's evidence of retaliatory motive consisted of only "ambiguous or conclusional statements." *Id.*

Here, WMT has shown that working overtime was an essential function of Jiles's job, which is somewhat similar to the attendance issue in *Richardson*. Jiles's personal physician prohibited overtime (and imposed temperature restrictions), and WMT's third-party medical reviewer did not have any reason to disagree with these restrictions. Dkt. 27, Ex. Q at 23–26. Notwithstanding the statements by Jiles's supervisor and hubmanager and the perceived lack of empathy by Bangma that lead to an inference of discriminatory motive, WMT has presented sufficient evidence to show that it would have terminated Jiles's employment anyway because he could not perform the essential functions of his job.

WMT's motion for summary judgment on Jiles's FMLA claims is GRANTED.

## D.     Texas Workers Compensation

Jiles asserts that WMT retaliated against him because he filed a claim under the Texas Workers' Compensation Act in violation of section 451 of the Texas Labor Code. Dkt. 14. WMT seeks summary judgment on Jiles's Workers' Compensation retaliation claim, asserting that Jiles cannot establish a causal connection between his termination and his Workers' Compensation claim. Dkt. 27 at 22. Jiles contends that it "is clear that Jiles's worker's compensation claim was the motivator for WMT's decision to terminate him." Dkt. 31 at 32.

Under Texas law, a "person may not discharge or in any other manner discriminate against an employee because the employee has . . . filed a workers' compensation claim in good faith." Tex. Labor Code Ann. § 451.001(1). The plaintiff bears "the burden of establishing a causal nexus between the filing of a workers' compensation claim and his discharge or other adverse action taken by his employer." *Piper v. Kimberly-Clark Corp.*, 970 F. Supp. 566, 574 (E.D. Tex. 1997), *aff'd* 157 F.3d 903 (5th Cir. 1998). The plaintiff is not required to show that the workers' compensation claim was the sole reason, "but he must establish that it was a determining factor." *Id.* (citing *Parham v.*

*Carrier Corp.*, 9 F.3d 383, 386 (5th Cir. 1993)). The employee may prove a causal link with either direct or circumstantial evidence. *Parker v. Valerus Compression Servs., LP*, 365 S.W.3d 61, 67 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). Circumstantial evidence may include "(1) knowledge of the compensation claim by those making the decision on termination; (2) expression of a negative attitude towards the employee's injured condition; (3) failure to adhere to established company policies; (4) discriminatory treatment in comparison to similarly situated employees; . . . (5) evidence that the stated reason for the discharge was false"; and (6) temporal proximity.[7] *Id.* If the plaintiff can demonstrate a causal link, the employer may rebut this by showing that "the discharge was actually for a reason unrelated to the plaintiff's pursuit of workers' compensation benefits." *Piper*, 970 F. Supp. at 574. The burden then shifts back to the plaintiff to provide controverting evidence of retaliatory motive. *Id.*

Here, Jiles's evidence of causation is the same as the causation evidence for the FMLA claim—that his supervisor and hub manager made comments or wrote emails about his taking so much leave and that his leave was detrimental to operations. *See* Dkt. 31 at 32 (summarizing these statements). These comments, which were not made by the decisionmakers, are best characterized as circumstantial evidence of "a negative attitude towards the employee's injured condition." Moreover, the primary decisionmakers for the termination, Bangma and Brown, were copied on some of the correspondence relating to the workers' compensation claim, but they were not involved in processing the claim. Dkt. 32-5 (Bangma Dep.) at 23. Jiles admitted during his deposition that WMT worked with him on the claim and that he returned to work after the injury. Dkt. 32-1 (Jiles

---

[7] "This evidence is relevant for determining whether a causal link exists, both in examining whether the employee established a prima facie case and the ultimate issue of whether the employee proved a retaliatory motive for the adverse employment action." *Parker v. Valerus Compression Servs., LP*, 365 S.W.3d 61, 67 (Tex. App.—Houston [1st Dist.] 2011, pet. denied).

Dep.) at 136–37. Additionally, the timing is not particularly suspect because Jiles returned from his workers' compensation leave on or about May 8, 2014, and he continued to work until approximately June 4, 2014. *Id.* at 50–58. His employment was terminated on August 27, 2014, after the expiration of his FMLA leave. Dkt. 27, Ex. R. There is no evidence of similarly situated employees who could not work overtime but did not take workers' compensation leave. And there is no evidence that the stated reason for discharge is false. In sum, the causation evidence is weak.

Even if there were sufficient circumstantial evidence to infer causation, WMT can show that the discharge was unrelated to Jiles's workers' compensation claim because being able to work overtime is an essential function of the delivery specialist job and Jiles's physician restricted him from working overtime. Jiles has provided no evidence of a discriminatory motive that controverts WMT's legitimate reason for discharge. WMT's motion for summary judgment on Jiles's Texas Labor Code claim is GRANTED.

## E.    Requests for Admission

WMT submitted its First Set of Requests for Admission as summary judgment evidence. Dkt. 27 at 2 n.1 & Ex. C. WMT contends that it served the requests on April 24, 2017 and that, as of the date of WMT's motion for summary judgment (September 29, 2017), Jiles had not responded to the requests. Dkt. 27 at 2 n.1. WMT thus asserts that the requests are deemed admitted as a matter of law pursuant to Federal Rule of Civil Procedure 36(a)(3). *Id.*

Jiles asserts that WMT did not formally seek to have the requests deemed admitted and did not even confer with his counsel about this issue before filing the motion for summary judgment. Dkt. 31. Jiles then reminds the court that it "forgave Defendant's failure to respond to Plaintiff's **entire** first set of discovery, after a hearing and opportunity for all to be heard." *Id.* Jiles appears to request that he also be allowed to respond late. *See id.* ("If Defendant were to pursue such a

motion to have admissions deemed admitted, Plaintiff would remind the Court of its prior ruling allowing Defendant to respond to Plaintiff's first set of interrogatories, production and admissions."). *Id.*

WMT contends that it is not required to move to have the admissions admitted because Rule 36 is self-executing. Dkt. 44. It also stated that Jiles had still not made an effort to respond to the requests as of the filing of the reply on October 31, 2017. *Id.* Additionally, WMT points out that the court did not previously forgive its failure to respond to requests for admission. *Id.* Rather, the issue related only to interrogatories and requests for production. *Id.*

First, the court notes that the original discovery deadline was March 31, 2017. Dkt. 17. During the January discovery hearing, the court gave WMT until February 10, 2017, to respond to outstanding discovery, and it encouraged the parties to discuss extending the discovery deadline and attempt to reach an agreement. *See* Jan. 31, 2017 Dkt. Entry. The court thereafter granted a joint motion to amend the scheduling order, which set the discovery deadline at August 31, 2017. Dkts. 23, 24. Not only was the deadline to respond to the requests for admission substantially overdue by the time WMT filed its motion for summary judgment, but the discovery deadline had passed. This is a completely different circumstance than the court was presented in January 2017.

Second, Federal Rule of Civil Procedure 36(a)(3) states:

> A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney. A shorter or longer time for responding may be stipulated to under Rule 29 or be ordered by the court.

Rule 36(b) states:

> A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended. Subject to Rule 16(e), the court may permit withdrawal or

amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits. An admission under this rule is not an admission for any other purpose and cannot be used against the party in any other proceeding.

These rules make clear that the requests were automatically admitted when Jiles failed to respond within thirty days and did not each an agreement to extend the deadline with WMT's counsel. It was then *Jiles*'s responsibility to file a motion if he wanted relief from the deemed admissions. Jiles did not file such a motion. To the extent Jiles's argument can be construed as a motion to withdraw the deemed admissions, the motion is DENIED. The court's analysis on the motion for summary judgment above does not depend on any of the deemed admissions, as WMT did not significantly rely on these admissions in its briefing. Thus, there is no need to withdraw the admission to promote the presentation on the merits.[8]

---

[8] That being said, the court notes that if it had relied on the admissions, they strongly support the court's determination that summary judgment should be granted. Specifically, by failing to respond, Jiles admitted the following:

- Working overtime/on-call is a requirement of the delivery specialist position. (RFA 4)
- Working in temperatures exceeding 90 degrees would have posed a threat to Jiles's safety in August 2014. (RFA 10)
- Jiles's return-to-work authorization stated he could not safely work overtime. (RFA 11)
- Jiles did not propose a reasonable accommodation that would have allowed him to safely work overtime or in temperatures above 90 degrees during his meeting on August 20, 2014. (RFA 13)

Dkt. 27, Ex. C.

## IV. CONCLUSION

WMT's motion for summary judgment is GRANTED. All of Jiles's claims are DISMISSED

WITH PREJUDICE. A final judgment will issue concurrently with this order.

Signed at Houston, Texas on March 13, 2018.

_____
Gray H. Miller
United States District Judge